IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 11-cv-02007-MSK

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION,

    Plaintiff,

v.

FRONTIER AIRLINES, INC.,
REPUBLIC AIRWAYS HOLDINGS, INC., and
FAPAINVEST, LLC,

    Defendants.

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

---

**THIS MATTER** comes before the Court on the Motion to Dismiss **(#2)** filed by Defendants Frontier Airlines, Inc. ("Frontier") and Republic Airways Holdings, Inc. ("RAH"), to which the Plaintiff International Brotherhood of Teamsters, Airline Division ("IBT") responded **(#18)**, and Frontier and RAH replied **(#19)**. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

### I. Background

This is a labor dispute arising under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq*. ("RLA"), which governs labor relations in the airline industry. The provisions of the RLA are extended to the airline industry by virtue of 45 U.S.C. § 181, which covers "every common carrier by air engaged in interstate or foreign commerce, and every carrier by air transporting mail for or under contract with the United States Government, and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers."

According to the Complaint (#**1**), RAH is a holding company which had (and continues to have) several airlines as subsidiaries, including Chautauqua Arlines Inc., Republic Airlines, Inc., and Shuttle America Corp. ("Republic subsidiaries"). IBT was the exclusive bargaining representative of pilots employed by those airlines.

In 2009, RAH acquired Frontier and another airline, Lynx Aviation, Inc. At the time of acquisition and thereafter, pilots at Frontier were represented by the Frontier Airline Pilots Association ("FAPA"). In 2009, RAH also acquired Midwest Airlines, Inc. ("Midwest").

On October 10, 2010, IBT applied to the National Mediation Board ("NMB") for a finding that the Republic subsidiaries, Midwest, Frontier, and Lynx comprised a "single transportation system" for RLA representation purposes. FAPA was a party to the proceeding and opposed IBT's application, contending that Frontier was a separate carrier, not part of a larger transportation system.

On April 7, 2011, the NMB determined that a single transportation system existed for a pilots employed by the Republic subsidiaries, Midwest, Frontier and Lynx–*i.e.*, that all of these pilots together comprised a single bargaining unit.[1] In making this finding, the NMB relied on the following facts: (1) that the same senior managers oversaw all operating carriers; (2) the same individuals served as the CEO, COO, and Vice President of Labor Relations and Human Resources for all the operating carriers; (3) the Frontier and RAH websites represented to the public that Frontier's "branded" operations were flown by Frontier, Lynx, Republic, and Chautauqua; (4) the employees of all the operating carriers were subject to the same operational policies and most labor relations policies (except for differences due to different collective

---

[1] Prior to this determination, the pilots of Frontier, not including the pilots from the other airlines, were considered a single bargaining unit.

bargaining agreements); and (5) employment opportunities on all carriers were listed and recruitment is handled through a single RAH website. On April 11, 2011, FAPA requested reconsideration of the NMB's single transportation system determination, which was denied.

On May 2, 2011, the NMB authorized an election to select an exclusive bargaining representative for the newly designated bargaining unit (the pilots of the Republic subsidiaries, Frontier, Midwest and Lynx combined).  IBT was the only labor organization that appeared on the ballot.  The NMB scheduled a June 1-27, 2011 voting period with a ballot tally on June 27, 2011.

Unhappy with NMB's determination, during the voting period FAPA and Frontier executed a Letter of Agreement 67 ("LOA 67"), that was ratified by FAPA-represented Frontier pilots.  LOA 67 purported to amend the Frontier pilots' collective bargaining agreement with Frontier by including a grant of wage and benefit concessions to Frontier, equity ownership in Frontier for FAPA-represented pilots, and establishment of a Frontier profit-sharing plan for FAPA-represented pilots.

In addition, Frontier and RAH separately agreed to reduce RAH's equity position in Frontier to forty-nine percent (49%) or less, and to make other changes that impacted the facts upon which the NMB relied in making its determination that there was a single bargaining unit and scheduling the voting period. The agreement required Frontier to "immediately" redevelop a "unique" Frontier website for all sales, operational, and recruitment purposes.  It also required the parties to take various steps to separate Frontier's management structure from that of the other RAH subsidiaries - for example, Frontier was to have a separate COO and Director of Labor Relations who would report to the Frontier COO.  Frontier's human resources and payroll functions were to be separated from those of RAH, and Frontier was to develop and use a

separate employee handbook for Frontier employees. These changes were to be implemented no later than December 31, 2011.

Based on the agreements reflected in LOA 67, on June 22, 2011 a letter[2] was sent to the NMB requesting that the upcoming election be postponed so that the NMB could consider whether the restructuring would affect its finding that there was a single bargaining unit for which a single representative should be elected. The NMB denied the postponement request and the election proceeded.

On June 24, 2011, FAPA and Frontier entered into a revised LOA 67. The revision contained many of the same terms, but the earlier equity and profit-sharing provisions and the provisions regarding organizational restructuring were conspicuously absent. Such terms were placed in a separate "Commercial Agreement," which expressly stated that it was not part of the collective bargaining agreement nor subject to collective bargaining.

The Commercial Agreement was executed on June 24, 2011 by Frontier, RAH, and an entity called FAPAInvest, LLC. In the Commercial Agreement, FAPAInvest was described as the entity "acting on behalf of those persons employed by [Frontier] as of the date of Letter of Agreement 67 [*i.e.*, the Frontier pilots represented, at the time, by FAPA]. . . ." According to the Commercial Agreement, final plans and agreements with regard to equity and profit sharing would be developed, and "FAPAInvest or its designee(s), successor(s) or assigns have the sole authority to represent the interest of the Participating Pilots in any matter related to this Agreement." Commercial Agreement, **#1-5**, Sec. E.

On June 27, 2011, IBT was elected and certified as the exclusive bargaining

---

[2] Authored by an attorney, it refers generically to "the Company". As a consequence, it is not clear to the Court on behalf of what entity the letter was sent.

representative of the pilots employed by all of the RAH airline subsidiaries. Thereafter, IBT commenced this lawsuit alleging violations of the RLA for which it requests that the LOA 67 and Commercial Agreement be invalidated.

Generally IBT contends that by entering into LOA 67 and the Commercial Agreement, RAH and Frontier violated various provisions of 45 U.S.C. § 152. Although the Complaint states separate claims, these can be grouped into several general categories: (1) the Defendants interfered with the representation election and the pilots' choice of representative in violation of 45 U.S.C. § 152, Third and Fourth (Claims 1, 2, and 4); (2) the Defendants violated 45 U.S.C. § 152, Ninth by preventing IBT from negotiating regarding profit sharing and equity participation (Claims 3 and 6); and (3) the Defendants' conduct breached an existing collective bargaining agreement prohibiting maintaining or operating Frontier as a separate carrier for representation purposes, in violation of 45 U.S.C. § 152, First, and 45 U.S.C. § 156.

In Motion to Dismiss, the Defendants assert a variety of legal challenges based on limits to this Court's jurisdiction over claims arising under the RLA. In addition, they contend that because IBT has suffered no injury, it lacks standing, to bring a claim under the RLA, and that the conduct complained of does not violate any provision of the RLA.

## II.  Analysis

**A.    Standard of Review**

    **1.    Jurisdiction**

A plaintiff who sues in federal court has the burden of establishing federal jurisdiction to hear the claim. *See Marcus v. Dep't of Revenue*, 170 F.3d 1305, 1309 (10th Cir.1999). Indeed, because the jurisdiction of federal courts is limited and there is a presumption against the jurisdiction of a federal court to hear the claim, the party invoking federal jurisdiction bears the

burden of demonstrating that the exercise of jurisdiction is proper. *See id.* Motions to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) can be in one of two forms. *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir.2003). First, the moving party may bring a facial attack as to the sufficiency of the complaint's allegations regarding the existence of subject matter jurisdiction. In reviewing facial attack on the complaint, a district court accepts the allegations in the complaint as true. *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.1995). Alternatively, the moving party may go beyond allegations in the complaint and attack the factual basis upon which the plaintiff bases subject matter jurisdiction. *See Maestas*, 351 F.3d at 1013.

Here, the Defendants' challenge to the Court's subject matter jurisdiction generally amounts to a facial attack and so no factual determinations are necessary to resolve the motion. The specific limitations of the RLA on this Court's jurisdiction are discussed below.

**2. Lack of Standing; Absence of Case or Controversy**

Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies. *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009). To satisfy the standing requirement of Article III, a plaintiff must demonstrate: (1) he has suffered an injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992).

Because many of IBT's allegations concern potential future injury and IBT seeks prospective relief to prevent such harm, to establish an actual case or controversy, IBT must show that the "threatened injury is real, immediate, and direct," *Davis v. FEC*, 554 U.S. 724 (2008) (citation omitted), or the existence of a continuing injury, *Dias v. City and County of*

*Denver*, 567 F.3d 1169, 1177 (10th Cir. 2009).

**B.        Applicable Provisions of the RLA**

IBT relies primarily on 45 U.S.C. § 152 for its claims. The pertinent sections are set forth as follows:

> **First. Duty of carriers and employees to settle disputes**
>
> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . .
>
> * * *
>
> **Third. Designation of representatives**
>
> Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. . . .
>
> **Fourth. Organization and collective bargaining; freedom from interference by carrier . . .**
>
> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. . . . No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .
>
> * * *
>
> **Ninth. Disputes as to identity of representatives; designation by Mediation Board; secret elections**
>
> If any dispute shall arise among a carrier's employees as to who

> are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, . . . the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. . . .

45 U.S.C. § 152.

IBT also asserts that the Defendants violated 45 U.S.C. § 156, which sets forth notice and waiting periods when carriers and employee representatives wish to make changes to agreements regarding rates of pay, rules, or working conditions.

Pertinent to consideration of the proper role for this Court is recognition of the role of various labor agencies under federal law. "The RLA evinces a strong preference for alternative dispute resolution and sharply limits judicial involvement in labor issues." *Air Line Pilots Ass'n, Int'l v. Guilford Trans. Indus., Inc.,* 399 F.3d 89, 92 (1st Cir. 2005).

With this admonition in mind, the Court notes that the characterization of a dispute affects the role that the Court should play. In general, disputes relating to collective bargaining agreements are characterized as "major" or "minor" under the RLA. Major disputes generally concern the formation of or negotiated changes to an agreement; minor disputes, in contrast, seek to enforce existing contractual rights and arise out interpretation or application of existing collective bargaining agreements. *Bhd. of Maint. of Way Emps. Div. v. Burlington Northern Santa Fe Ry. Co.*, 596 F.3d 1217, 1222 (10th Cir. 2010).

A minor dispute must be submitted to binding arbitration. 45 U.S.C. § 184. A major dispute can be heard in federal court, but only upon completion of certain mediation procedures. 45 U.S.C. §§ 155, 156, 183. The parties must maintain the status quo pending exhaustion of

mediation procedures; a federal court may enjoin a party from unilaterally taking steps to alter the status quo. *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302–04 (1989).

In addition, disputes concerning the definition of the bargaining unit and the representative for collective bargaining are considered to fall within the exclusive jurisdiction of the NMB. 45 U.S.C. § 152, Ninth; *Minjares v. Indep. Ass'n of Continental Pilots*, 293 F.3d 895, 898 (5th Cir. 2002) ("Disputes which involve the determination of the certified representative of airline employees in collective bargaining and contract administration are classified by the RLA as 'representation disputes'" and must be heard by the NMB, not a federal court).

Federal courts have jurisdiction to hear certain kinds of statutory claims, particularly disputes involving an employer's alleged interference with employees' rights to organize and designate an exclusive bargaining agent, as guaranteed by 45 U.S.C. § Third and Fourth. These provisions "bar covered employers from meddling in, coercing, or unduly influencing employee's representational choices and from interfering with the right to unionize." *Guilford*, 399 F.3d at 93. Although these provisions generally concern the pre-certification rights and freedoms of unorganized employees,[3] judicial intervention in post-certification disputes is appropriate where "it is clear that the employer's conduct has been motivated by anti-union animus or an attempt to interfere with its employees' choice of their collective bargaining representatives, or constitutes discrimination or coercion against that representative, or involves acts of intimidation which cannot be remedied by administrative means." *Indep. Union of Flight*

---

[3]This focus on ensuring that the process leading up to the certification of a bargaining representative is free of interference and coercion is consistent with the heavy emphasis in the RLA on alternative dispute resolution. "The effectiveness of these private dispute resolution procedures depends on the initial assurance that the employees' putative representative is not subject to control by the employer and on the subsequent assurance that neither party will be able to enlist the courts to further its own partisan ends." *See Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 441 (1989).

*Attendants v. Pan Am. World Airways, Inc*., 789 F.2d 139, 142 (2d Cir. 1986) (citations and internal punctuation omitted). The United States Supreme Court has noted " we have understood judicial intervention in RLA procedures to be limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act.'" *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 441 (1989); *see also Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 874 F.2d 439 (7th Cir. 1989) ("where the adjustment board cannot provide a remedy that will protect a party from the consequences of a violation of the Railway Labor Act, the district court has an equitable jurisdiction to do so, whether or not the violation seems 'major' or 'minor' in an ordinary-language sense.").

**C.      Plaintiff's Claims**

      **1.      Interference with Election and Employees' Choice of Bargaining Representative (Claims 1, 2, and 4)**

IBT contends that the Defendants have interfered and otherwise attempted to influence the pilots' choice of representation in three distinct ways: (1) by interfering with the election and IBT's role as representative by attempting to reverse the single transportation system finding of the NMB while the balloting was ongoing and postponing the vote tally (Claim 1); (2) by proposing to make structural changes that would ultimately allow Frontier to be considered a carrier separate from the other subsidiary airlines, which would assist FAPA in returning to its former role as the exclusive bargaining representative of Frontier's pilots (Claim 2); and (3) by removing aspects of the contemplated profit-sharing plan and changes to the ownership structure from the collective bargaining agreement and making them contingent on the success of the organizational changes to Frontier, thereby limiting IBT's ability to bargain on these issues and impairing its effectiveness as a representative (Claim 4). The Defendants seek dismissal of these

claims arguing, *inter alia*, that IBT suffered no injury in fact and/or its alleged future injury is too speculative to show any real harm. In the absence of an injury, IBT has have no standing to assert the interference claims, and there is no case or controversy to determine.

According to IBT's own allegations, Defendants' alleged attempt to postpone the election was unsuccessful, and IBT won the election. Under these facts, IBT suffered no injury and there is no claim or controversy to be resolved. Accordingly, Claim 1 of the Complaint is dismissed, with prejudice.

With respect to Claims 2 and 4, the alleged harm is prospective harm. IBT claims that two agreements will impact its standing to bargain for the Frontier pilots and to bargain effectively for the entire collection of pilots for which it was elected to be a representative. Defendants note, that before any injury would occur regarding a future election, the NMB would first have to reverse its finding that there was a single bargaining unit, hold another representation election, and IBT would have to lose in that election. IBT does not dispute that this is the case as to its official authority, but it suggests that its practical influence is diminished.

On this record, the Court cannot determine whether there is any practical impairment of IBT's rights, and the chain of events necessary to affect its official authority is too attenuated and remote to amount to a real injury for the purposes of standing. Therefore, at this point, the possibility of harm is simply to speculative to state a claim.

These claims (Claims 2 and 4) will be dismissed without prejudice. Should IBT come forward with alleged facts sufficient to demonstrate a concrete and particularized injury, it may seek to amend within the deadline set in the Scheduling Order (or extension thereof).

    **2.    Claims 3 & 6: Impairment of IBT's Ability to Negotiate and/or Refusing to Treat with IBT in violation of 45 U.S.C. § 152, and Ninth**

Claims Three and Six allege that by entering into an agreement separate from the

collective bargaining agreement, by which only FAPAInvest can represent the Frontier pilots, the Defendants have violated section 152, Ninth. This provision requires that once an exclusive bargaining representative is certified by the NMB, "the carrier shall treat with the representative so certified as the representative of the class."

The parties do not dispute that this Court has jurisdiction to address this type of violation, but the Defendants contend that the allegations of the Complaint are insufficient to state a cognizable claim, for several reasons including that (1) RAH is not a "carrier" subject to section 152, Ninth; (2) the conduct occurred before IBT was certified, and so there was no obligation to treat with IBT at the time; (3) the Defendants have no duty to treat with IBT with respect to the Commercial Agreement.

**(a)** **RAH as "carrier"**

As noted, section 152 Ninth requires that a "carrier" treat with the certified representative. RAH is a holding company that owns the various airline subsidiaries, including Frontier. The Defendants argue that RAH, therefore, is not a carrier and is not subject to this provision.

Although other provisions of section 152 apply to a "carrier, its officers, or agents," the Ninth provision only addresses carriers, indicating clear intent to limit application of this provision. IBT has not identified any legal authority that includes RAH in the definition of "carrier" as this term is used. Accordingly, dismissal of these claims as to RAH is appropriate.

**(b)** **Conduct Occurring Before Certification**

Section 152, Ninth imposes an obligation to treat with a bargaining representative <u>after</u> it has been certified by the NMB. There is no dispute that the agreements at issue here were executed before IBT was certified as the pilots' exclusive bargaining representative, although

their effect carried into the future.

The Defendants argue that because they executed the agreements before they had an obligation to treat with IBT, there is no legal cause of action. Similarly, they contend that the Commercial Agreement does not violate Frontier's duty to treat exclusively with IBT on matters relating to wages, rules, and working conditions because "IBT remains free to bargain on behalf of the Frontier pilots for equity and/or profit sharing above and beyond that granted to the LOA 67 pilots; it simply cannot undo the guaranteed benefits those pilots received for their past concessions." Def.'s Brief in Support of Mo. to Dismiss, **#3**, at 26.

Defendants' argument, however, ignores the effect of these agreements. Although the Defendants had no obligation to treat with IBT before it was certified, it is another question whether the Defendants could preemptively preclude IBT from being able to negotiate on behalf of members of the bargaining unit after its certification. As noted above, LOA 67 made modifications to the collective bargaining agreement regarding pay adjustments and other matters but tied them to equity participation and profit sharing benefits placed outside the scope of the collective bargaining agreement in the Commercial Agreement. The Commercial Agreement contemplates further negotiations but provides that only FAPAInvest may represent the covered employees. In other words, even though IBT is now the certified representative of the pilots covered by this agreement, only FAPAInvest is permitted to negotiate the final terms of any plans or agreements governing such benefits. This plausibly suggests a violation of section 152, Ninth.

Defendants similarly contend that preventing IBT from negotiating on these matters is analogous to providing guaranteed benefits to one class of pilots in the bargaining unit, but not for others, which has been held to be permissible in *Renneisen v. Am. Airlines, Inc.*, 990 F.2d

918, 924 (7th Cir. 1993). *Renneisen* is distinguishable in numerous respects from the issues presented here. In that case, as a concession, a union negotiated an agreement with an airline which divided pilots hired before a certain date, who were given certain wage and benefit guarantees (the "A-scale pilots"), from those hired thereafter, who were not given such guarantees ("B-scale pilots"). The agreement further provided that the guarantees would not be rebargained unless a majority of the A-scale pilots voted to do so. Legal challenge was brought by several B-scale pilots, who argued that the agreement amounted to a restraint on collective bargaining under the RLA. The Seventh Circuit, however, held that section 152 "was not designed to give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest." 990 F.2d at 924. As both the union and the employer were abiding by the agreement, the court held that there was no cause of action under the RLA when an employer "honors the terms of an agreement with a union that the union itself has not challenged."

The issue here is not whether some pilots can be guaranteed certain benefits while other employees in the same bargaining group are not given the same guarantees. Rather, the matter presented is whether an about-to-be ousted union and an employer can create an agreement whereby the successor union would be prevented from negotiating profit-sharing and equity participation matters for a portion of its bargaining unit. *Renneisen* does not address or answer this question.

Giving IBT the benefit of all favorable inferences, the alleged facts are adequate to allege that the Defendants' entered into an agreement that had terms that could be contrary to law – an arrangement whereby the employer would not have to negotiate with IBT over a significant matter affecting wages and benefits of Frontier pilots. Without determining the merits of the

claim, it is sufficiently pled as to the Defendants other than RAH (as noted above.)

### (c) Duty to Treat Regarding Commercial Agreement

Finally, the Defendants contend that bargaining obligations do not apply in the context of the Commercial Agreement because FAPAInvest is no more than a trust holding the investment of the covered pilots. This elevates form over substance.

Giving IBT the benefit of all favorable inferences, the Commercial Agreement concerns financial benefits to the covered employees, which is an area to which a duty to bargain attaches. In addition, as noted above, this does not involve a completed plan that will simply be administered by FAPAInvest. Rather, pursuant to the Commercial Agreement, FAPAInvest will act as a negotiating representative with respect to the creation of the final profit-sharing and equity sharing plans, the details of which have yet to be worked out. This plausibly states a claim that the Defendants (excluding RAH), by setting up this arrangement, are treating with an entity other than the exclusive bargaining representative for these employees with respect to subject matter covered by the RLA.[4]

### 4. Claim 5: Unilateral Modification of Collective Bargaining Agreement in violation of 45 U.S.C. § 152, First, and 45 U.S.C. § 156

Claim 5 asserts that the two agreements at issue amount to a unilateral modification to a separate collective bargaining agreement in violation of 45 U.S.C. § 152, First and 45 U.S.C. § 156, which requires certain notice and waiting periods before changes can be made to the contract. According to the Complaint, IBT's collective bargaining agreement with RAH and the Republic subsidiaries ("IBT CBA") contains a term providing that the airlines "shall not

---

[4]The Court makes no determination regarding whether nullification of the agreements or an injunction ordering the Defendants to treat with IBT, or some other order, would be the appropriate remedy for this alleged violation.

establish any new airline (alter ego or otherwise) or acquire a controlling interest in any carrier . . . and maintain it as a separate carrier." The parties are currently engaged in major dispute resolution proceedings regarding changes to the IBT CBA. Frontier, however, is not involved in those proceedings because it is not a party to the IBT CBA. IBT contends that pursuant to LOA 67 and the Commercial Agreement, RAH and Frontier intend to operate Frontier as a separate carrier in violation of the IBT CBA. IBT contends that the execution of these agreements amounts to a unilateral change to the IBT CBA, and therefore a major dispute within this Court's jurisdiction. The Defendants argue that this is minor dispute regarding construction of the IBT CBA such that it must be settled by arbitration.

The Court need not resolve the issue whether the dispute is major or minor, however, for the purposes of the motion to dismiss. Regardless of the type of dispute, the Court would have jurisdiction to issue an appropriate preliminary injunction to maintain the status quo pending the completion of administrative procedures or to enforce administrative remedies. *Frontier*, 628 F.3d at 405-406; *see also Brotherhood of Maintenance of Way Employes Div./IBT v. Union Pacific Railroad Co.,* 460 F.3d 1277, 1283 (10th Cir. 2006) (federal district court has jurisdiction to enjoin strike during resolution of parties' minor dispute and to place conditions on the granting of that injunctive relief). Because some aspect of Claim Five may yet be justiciable in this Court, the Court declines to dismiss the claim at this point.[5]

---

[5]In addition, as noted by IBT, since Frontier and FAPAInvest are not parties to the IBT CBA, there is some question whether the System Board adjudicating the contractual dispute could provide a remedy that would fully address the harm allegedly occasioned by LOA 67 and the Commercial Agreement. In other words, while the board would likely have jurisdiction to declare whether the conduct at issue amounts to a violation of the IBT CBA or a change to the status quo during negotiation of a major dispute, it may or may not have the authority to fully redress such a violation, which again implicates a role for this Court. *See UAL Corp.*, 874 F.2d at 445 ("[W]here the adjustment board cannot provide a remedy that will protect a party from the consequences of a violation of the Railway Labor Act, the district court has an equitable

**IT IS THEREFORE ORDERED** that the Defendant's Motion to Dismiss **(#2)** is **GRANTED IN PART AND DENIED IN PART.** Claims One, Two, and Four of the Complaint are dismissed. All claims arising under 45 U.S.C. § 152, Ninth asserted against Defendant RAH are also dismissed. All other claims remain pending.

Dated this 29th day of March, 2012

                                                    **BY THE COURT:**

*[signature: Marcia S. Krieger]*

                                                    Marcia S. Krieger
                                                    United States District Judge

---

jurisdiction to do so, whether or not the violation seems 'major' or 'minor' in an ordinary-language sense.")